The case on the docket is 2-17-0471. The people of the state of Illinois, Lincoln, Appalachia v. Juan Tamayo, defendant's cousin, arguing on behalf of the defendant's cousin, Mr. Steven L. Walker, arguing on behalf of Lincoln, Appalachia, Mr. John G. Packer. All right, good morning, gentlemen. Mr. Walker, whenever you're ready. Good morning, Your Honor. Good morning. May it please the Court, my name is Steven Walker, and I represent the defendant of Illinois, Juan Tamayo, on behalf of the Office of the State of Illinois. Mr. Walker, I'm having a bad ear. Could you speak up? Oh, I can't hear either. We have a whole audience back there of a lot of different, I'm guessing, some interns and law students, as well as other counsels. So I know it will sound like you're shouting, like I'm doing now, but we really need to hear everything that you're going to say, please. Of course. Is this better? Well, you don't have to bend over, but just keep your voice up, real loud. Got it. Your Honors, there are two issues presented on appeal before you today. The third already being handled by our Supreme Court. The two issues are, first, whether the police executed a proper exigent circumstance arrest. We argue they did not. And second, contingent upon that, whether the officers had consent to enter the apartment complex to execute the arrest. So the facts, it would be easier to go chronologically with these facts. Well, I'm going to suggest we not start with the facts since we've read the facts. I would ask that you use the facts in answering a couple of questions. First, I have regarding exigent circumstances. As I read your brief, you really take issue with three of the dormant factors that are used to analyze whether or not there are exigent circumstances. The first being whether or not the crime under investigation was recently committed. In dormant, the time period is four hours. Our time period here is about six hours, 45 minutes. Why wouldn't just a couple hours more constitute a recently committed crime? Your Honors, that factor is still fairly nebulous. So while dormant found that four hours was sufficient, I believe on these facts, six hours, six and a half hours wasn't reasonable in that the crime was not recently committed based on the seriousness of the crime and the actions that officers took in apprehending the crime. Would you agree, though, that it's not a strictly a You could never really legitimately announce a bright line. Four hours is good, six hours is bad. Doesn't it sort of depend on what the police were doing and demonstrate what they were doing in the interim that would bear on whether or not it was recently committed? I completely agree, Your Honor, and to take that a step further, all of this boils down to whether the officers' actions were reasonable under the totality of the circumstances. Tell us why it wasn't, why they weren't. In this case, Detective Grace had probable cause after interviewing these witnesses. These interviews started occurring, according to Detective DeWilding, at about 9.30. That's when the witnesses were at the police department and being interviewed. And you're saying they had probable cause after those witness interviews? So one of the witnesses identified Tamayo as one of the individuals in the car. They then spoke with two investigators in their gang department who identified Tamayo as the likely suspect. Did they have probable cause then? Yes, they had probable cause based on Right after they talked to the detectives? After they talked to the detectives or when they Go ahead. Before they found the car. Before they found the car. Because Detective Grace was able to find that the car was registered to Tamayo or to his father and determined where he lived based on that information. So he knew where Tamayo lived. But even before that, Go ahead. Even before that, he had probable cause based on the eyewitness identification. Excuse me, eyewitness identification of Mr. Tamayo as the shooter? As one of the individuals in the car. In the car. So what would they charge him with then if they had probable cause at that point? And nobody positively identified him as the shooter but just someone in the car. There was probable cause to arrest him for what at that point? Runners, based on the evidence, based on the information they got from the gang investigators or the gang detectives, they knew that either Tamayo or Kania were involved in the shoot. So based on that information, the officers could request a warrant to arrest Tamayo in association with the shooting. He was at least a participant in the shooting. He could at least be held accountable if he knew that the gun was in the car. But how would they know that without developing that further? I mean, yes, they knew he was in the car, but that doesn't necessarily make him accountable legally because you're in a car, does it? Right, but he did create probable cause for arrest. It doesn't mean that he's legally liable. What's the probable cause because he's in the car? What's the probable cause being in the car alone? Mr. Tamayo was not in the car alone. One of the witnesses stated that there were at least five people in the car and another witness stated that they saw him in the back passenger seat, I believe. And he flashed gang signs? And he was flashing gang signs, correct. Now, the State argues that probable cause to arrest really, the defendant only became clear when the detectives, Grace and DeWald, saw the incriminating items in defendant's car. That's actually when they went to the location of where the defendant lived and saw the car in the parking lot. The witness, one of the witnesses identified that green car as being the one that he saw, and then the officers looked in. So why is the State wrong that it wasn't, they didn't have probable cause before then? Your Honor, I would argue that they had probable cause before then. The essence of my argument is basically that Detective Grace could have obtained a warrant from a 24-hour on-duty judge prior to arresting Tamayo. Every step he took in this case was basically that of an arrest with a warrant, but conducted without a warrant. His actions in arriving at the apartment complex indicated that he wasn't prepared to make an arrest when he got there. He had to wait for Sergeant Holtz of the Grace Lake Police Department to bring equipment and additional men to effectuate the arrest. When he got to the door, he knocked and then asked to come in. He didn't make a forcible but peaceful entry. He didn't push the Tamayo family aside. He asked, is Juan home? So when could they have gotten the warrant and how could they have gotten it? So once they found Tamayo's car parked in that parking lot and determined that he was likely home, as Sergeant Holtz showed, Tamayo was asleep in his bed. So he was of no threat to anyone. He had to stop you there, but we have limited time, and you've identified three factors you wanted to hone in on. One was whether it was recently committed, which you started to address. The second is whether there was any deliberate or unjustified delay during which time the police could have gotten a warrant. You're sort of bleeding into the second factor. Is that right? Yeah, that's what I understood. We're talking into the second factor. So when – how could they have gotten the warrant? There was a 24-hour on-duty judge available. Would they have to go to his house or is there some other way they could have gotten this? The record does not contain that information. It doesn't say the telephone? That they could have gotten it by telephone? It could contain it via telephone. I wasn't sure if you were referencing the paper warrant or something to that effect. The how is how they could mechanically get it. So all they had to do was make a phone call. Is that right? Yes, correct. Well, more importantly, the location of that car and the address that they had for Mr. Tamayo, they're in a complex, but where was that car with reference to the actual address of Mr. Tamayo? Was it right there or did they have to go a ways? Based on the testimony, Your Honor, the car was parked a bit a ways from the apartment complex where they eventually apprehended Tamayo. So, I mean, one of the issues when you talk about exigent circumstances is the ability of the person you're looking for to get away. Correct. What was the likelihood that he could get away in that car? Go ahead. It was extremely unlikely because they had several bracelet police officers around the car getting ready to tow it. They found the car. They knew where it was. Right, exactly. And they were watching the car. Yes. And they were getting a warrant for the car, right, to be able to search it. Yes. A search warrant. That's the interesting part. Go ahead. Go ahead. If they could have gotten it, they were impressed of getting an actual search warrant. So are you saying then they should have been able to get an arrest warrant since there was already going to be a delay anyway? Correct, Your Honor. They had the men available. They had the equipment. There was really no difference in the way they executed this arrest from standing outside having guards posted at the door and then obtaining the warrant and then executing a similar arrest and the arrest they actually effected. Sergeant Holtz testified the way that Detective Grace went about coming into the apartment and then attempting to ram down the door was not, to his knowledge at least, a protocol when making that kind of arrest of an armed suspect. Holtz put a stop to it, put a kibosh to Detective Grace's immediate attempt to gain entry into Tamayo's room and went to make sure that Tamayo wasn't armed and perhaps ready to shoot him. So it's clear that Detective Grace, when he was acting, didn't fully concentrate. He executed this as though it was an arrest warrant. Again, he did the knock and announce. He got permission to enter. And then he proceeded to call out to Juan to tell him to come out and basically be apprehended. But he was sleeping. Yes, he was sleeping. So there would be little chance that he would escape. Is that right or that he knew they were looking for him? Even beyond that, as the First District pointed out in Brown, there was nothing that would have stopped the officers from surrounding the complex to make sure he didn't escape and then obtaining the warrant. Again, a 24-hour on-duty judge was available that they could have reached via telephone. So can we turn to the issue of consent for a couple minutes, please? At this point, we're focusing on whether or not the officers had consent to enter the multi-unit apartment building, correct? Correct. The issues of entry into the apartment in his room are not an issue, correct? Correct. Okay. In People v. Burns, our Illinois Supreme Court said it was unnecessary to apply the reasonable expectation of privacy approach to analyzing the Fourth Amendment, as that appeal could be decided really based on the property-based purlage approach that was in Florida v. Jardim. So why, if you can explain, why do you, in your brief, cite Burns  in the common areas of a locked apartment building? Of course. I believe that Burns touched on but did not directly address this issue, but that the court seemed to be stating in some that tenants, that police have to show that they obtain consent to enter any locked building. The apartment complex is home to various individuals, and each of them has a right to privacy in that complex unless the landlord allows somebody else in. Who said that? Nobody said that. What court has opined on that issue? Did you say Blake? Burns. No, I'm talking about Burns. I don't recall that being in Burns, that that proposition of law, as you just paraphrased it, is in there. That's not a proposition of law, Your Honor. It's actually more of a policy statement that I'm arguing from Burns, that the police cannot simply enter an apartment complex without at least obtaining consent from one of the denizens of the landlord. Does the fact that they don't, none of them can really recall how they got in, have something to do here with our decision? Yes, Your Honor. That is actually the crux of the issue, that these officers testified that the door was likely locked and that they buzzed somebody to get in. They don't say what they said to that individual, how that individual responded, anything. They just state that they likely buzzed somebody into going to the apartment. Now, the test for the State is to show that the officers obtained voluntary consent, and in order for that consent to be voluntary, they couldn't have threatened anybody over the intercom. Now, we don't know if the officers threatened anybody, but that burden was for the State, not the defendant. Well, didn't the State, I mean, doesn't Smith in an earlier 1992 Illinois Supreme Court case state just the opposite of what you felt Burns was saying with regard to reasonable expectation of privacy? In other words, that there is no reasonable expectation of privacy in the common areas of an unlocked, now this was an unlocked apartment building? Yes. If the apartment building was unlocked, this would be definitely allowed. So you think that's the key? Locked or unlocked? Correct, because obviously there is a set amount. Well, then how do you explain Bonilla? The court, the Illinois Supreme Court in Bonilla, had an unlocked apartment building, also did not opine on reasonable expectation of privacy, decided the issue which was related to the dog sniff of an apartment near the common area or landing there. They decided that case based on the principle or the idea of curtilage as well, didn't opine on the privacy issue. So according to the Supreme Court in Burns and Bonilla, it doesn't matter if it's locked or unlocked. I don't believe the court said that in Bonilla. I believe they identified that the apartment door was unlocked, and because they highlighted that, I believe that shows that that was an important factor in their analysis. They could have just as easily omitted the fact that it was locked or unlocked. They highlight that it's unlocked, and that this was a common area that anybody had access to. In this case, this is not a common area that everyone has access to. It's a common area that the residents, the denizens of that apartment have access to. They have a lock, they have a key that they need to be able to access it, and any guest would need to obtain their consent before entering. Well, if I can just point out, the Supreme Court in Bonilla said in paragraph 25, the facts of this case are nearly identical to those in Burns other than the unlocked status of the apartment building. Nevertheless, we conclude that this distinction does not create a difference. So respectfully, I guess the Supreme Court in this case doesn't support your argument. And I disagree with the dicta in the case. I believe in this case that the residents of that apartment complex had an expectation of privacy, otherwise they wouldn't have locked it. They could have easily just locked their apartment doors. Clearly, they wanted that security, and that security extends to the police. Mr. Walker, you'll have an opportunity to reply. Thank you. Thank you. Thank you. Mr. Barrett. Good morning, Your Honors. May it please the Court? Counsel? Counsel, will you start perhaps by quickly addressing the three points that we talked about with regard to exigent circumstances? Why should we extend the four hours in dormant to six hours and 45 minutes in order to analyze whether the crime was recently committed? Well, I think looking at the dormant factors, we know there isn't a bright line test. There's a reason there's so many of them. This is kind of a totality consideration. And, you know, the difference between four and six hours, when there's been a shooting and threat of violence, you know, isn't a big distinction in my mind. Okay. On a more important issue, I think the issue of probable cause. Why do you say that the police did not have probable cause until they actually looked in the car and had one of the witnesses identify the car? Why couldn't they have picked up the phone after they knew that Tamayo and Pina were focused on or identified as gang members by the detectives in the gang unit? Why couldn't they have had probable cause then and called to get a warrant? Well, at that point, they weren't certain that the car was registered to Tamayo. They first had to run it through the lead system, and after running it through the lead system and having a Grayslake officer go to his apartment and check that, indeed, that was registered to him, they were able to go to the apartment and then look for the evidence that would match. Okay. They hadn't matched it yet. Once they found that evidence, they actually waited for reinforcements to come, did they not? I mean, I don't know. The record is not clear as to what the timeline was. That wasn't provided in the record as to exactly how long they waited, but the record does reflect that they actually waited for, quote, reinforcement officers to come before they actually entered the building. So why, in that period of time, did they not pick up the telephone and call the 24-hour duty judge to get an arrest warrant? Well, we know from the record that it could take at least two hours to get a warrant issued. They know this was a violent crime. They called in security. Sergeant Holtz was a member of the SWAT team in Yves. They were relying on his expertise to gain entry and apprehend the defendant. So in that circumstance, you know, there was only one hour between the clear-showing problem causing the arrest. Now you're saying they didn't have enough officers to surround the building then for two hours to get this warrant? Well, at that time, there was a risk of flight. They didn't know if he was in there with his gang associate, Louie Pina. We know the gang officer said that these two guys had been seen doing shootings in the area. There was a pattern that was going on. They had just shot at the victims in this case. Fortunately, no one was shot or struck by the bullet. But the car was there and it was under constant surveillance at that point, correct? Sure. He could flee on foot. He could jump out the window, flee on foot, ambush them. There was a concern of being ambushed. There's two armed, potentially armed gang members here. All right, let me ask you this. You alluded to, at that point, they were attempting to get a search warrant for the car? For the car. So why couldn't they concurrently with that also seek an arrest warrant? There wasn't a risk that the car would run away. The car is a vehicle. It will sit there and they could secure it. A potentially armed suspect, you're dealing with a chaotic situation. You don't know what he's capable of at that point. So they took every precaution. They weren't delaying deliberately. This wasn't deliberate delay. They're guarding their own safety. They're guarding the safety of those around them. They approached the apartment with a ballistic shield. They had two guys with long rifles. They were clearly marked as police officers and blazing with police under vests. They weren't trying to surreptitiously gain entry by any means. And we know they gained consent at the inner door of the apartment. We know they had consent there. What we know is that it's not contested. So we're going to assume that they had consent. So we can infer reasonably from the facts that their behavior was consistent with consent at the outer door. All right. On the third element before we move on to the consent, how is it reasonable? What evidence is there in the record to assume that defendant knew the officers were looking for him? I mean, this third element is the element you referred to, that he might escape if he wasn't swiftly apprehended. I mean, how would they have known that the officers were looking for him in the first place? What evidence in the record is there that he had any knowledge? The evidence in the record is that they weren't willing to take any risks. You know, we could stipulate to some risks, or would that be a reasonable presumption, but they were erring on the side of caution. Given the circumstances, I think that was a reasonable measure. This was a multi-unit apartment building, right? Correct. What floor did the defendant live on? The first floor, 103. Somebody had identified that they saw him through a window, correct? Or they saw somebody laying on a bed, apparently asleep. Correct. So it wasn't like he was going to jump out that window right then, and that person was standing right there. There was testimony that they weren't certain that he was going to ambush them, that he was actually sleeping. They knew he was armed. You know, this is a guy being apprehended and sent to prison. Someone in that circumstance who's a gang member could ambush them, capable of anything. So I think their precautions were more than reasonable. So are you saying that any time there's a shooting and the suspect goes back to his house, it's automatically exigent circumstances because they couldn't flee? If someone fires a weapon into a car that's occupied by others, it's arguable they were trying to commit murder. So, yeah, I think that circumstance is different than someone that's just shooting a gun for fun up in here. You know, this is human life at stake here. Is it the state's burden to prove exigent circumstances? Who bears the burden? Well, on a motion to suppress, initially the defendant bears the burden to show that there's been a violation of the Fourth Amendment. And then once that burden shifts, then the state would have to prove that exigent circumstances were present. Well, I assume the burden must have shifted in this case, or they wouldn't have gotten into it, correct? They must have laid some foundation to shift the burden, right? Enough to call the witnesses and put evidence on, yes. So then it is the state's burden to prove there's an exigent need to conduct a warrantless search or arrest, right? Once it's shifted, yes. And that's what happened in this case? Yes. So it is your burden in this case? Yes. Okay. Now, with respect to the issue of consent to enter the building, you rely in your brief on United States v. Eisler in Eighth Circuit, 1977 case, to support your argument that there was no Fourth Amendment violation because the defendant had no reasonable expectation of privacy at the outer door to this appurtenant building. But our Supreme Court cited Eisler with disapproval in Bonilla. So is Eisler now consistent with Illinois law or not? And if not, what are you relying on? Your Honor, I'm not up to speed on the facts of Bonilla. If you could give me some of those facts. It was a job search case similar to Burns. Okay. But the building was unlocked. Okay. And the Supreme Court decided the case based on a curtilage approach, a property approach similar to Florida v. Jardines. Well, I think the difference there is the focus is on curtilage, the area right in front of the door, the door frame. And also, they had no reason to be there lawfully. There was no probable cause in that case. They had a hound and a hunch. You know, you can't just go on a fishing expedition. Here we have probable cause. Well, we know he's in the building because we've seen him. We know we have witnesses who say he did – he's one of the two people in this car that they can identify. Correct. And the police know that he's a gang member, whether it be Round Lake or Grayslake, Round Lake Beach or Grayslake. One or both of them know. But how did they get into the building? What's – you know, nobody could tell us how they got into that building. Right. Well, the testimony was they didn't have a specific recollection. I think that might be in part because Sergeant Holtz, who participates frequently in high-risk situations, I think he had testified that he'd been involved in over 300 high-risk entries. Normally what he would do is buzz in. Now, that testimony alone isn't going to support the entry as establishing consent. But what we have is more facts that can support it together. Taken together, we can get to consent. We know that they obtained consent at the apartment door inside. We know that the sister, Maria, defendant's sister, testified that anyone could be buzzed in at the call button. There's 11 other residents that they could have buzzed them in. And then the doors were not broken into. There was no evidence of any tampering at all. So that combined supports a reasonable inference of the entry. So you're saying that that later consent purges any taint with respect to a possible illegal entry into the apartment building? Is that your position? Not unequivocally, but taken together with the other facts. And the inference is drawn therefrom, yes. Well, the other facts that you just described was the consent of the parents and what happened in the apartment, right? Right. Let me ask you this. Do the police, does the evidence have to definitively establish how they got up to the door where the defendant was staying unless the defendant has an individual or collective protective interest in the common vestibule area? If you're arguing he doesn't, then does it matter how they got up there? Well, our position is that the Fourth Amendment protections didn't apply to the apartment. Right. So if you follow your logic when we ended up agreeing with you, they wouldn't have to definitively establish how they got in, right? Correct. Another important factor here is nothing was discovered in the commons area. There's nothing at issue. The weapon wasn't recovered in the commons area. There wasn't an arrest made in the commons area. There was no evidence at all obtained in the commons area. We don't get to the evidence until we have consent. We have consent at the door, then an arrest, and the handgun firearm obtained from there. Or wouldn't the converse be true if we conclude based on the case law that the defendant has either an individual or collective right of privacy at the common vestibule door, then you've got a problem. We believe that we've shown enough evidence of consent to get past that and certainly to educate the circumstances. How does this consent get them up to the prison apartment door? The consent, they don't talk. The record doesn't demonstrate who they talk to until they get up to the door. Correct. So we're back to the beginning. How did they justify their entering through the vestibule door if it's locked, if there was no discussion with anybody? Well, the reasonable inference that they acted in accordance to their custom in buzzing a resident to gain entry. Anyone can give authority to enter, any of the residents. So would we fill in the gaps? We're going to assume that this was done? Inferences have to be taken from evidence. Absolutely. That's our job. I think it's more than an inference with your suggestion. Well, the specific conclusion in Bonilla is we hold that the warrantless use of a drug detection dog, and we've got a dog that's a little different, at the threshold of defendant's apartment door violated his rights under the Fourth Amendment. So in that case, they had already gotten past the other door? Correct. And so just at his door, since he was in it, it was a protected general area, they couldn't take that drug detection dog to smell anything? Right. There was no probable cause to enter in that case. Whereas here we know there was probable cause. That was conceded to by defendant. They arrived at that other door with probable cause. The officers in that case had no probable cause. They had a hunch. They had a hum. That's about it. Well, isn't the state of the law in Illinois now a little uncertain? Isn't there a split in authority, especially at the appellate level, as to whether or not a tenant has a reasonable expectation of privacy in the common areas of an apartment building? I mean, we've got the Lyle case in the 1st District from 2002, and we have the Trull case on the other side, the 4th District case, which had a locked door. It says there was a reasonable expectation of privacy in common areas, although those cases predated Florida v. Jardim. We have federal cases that do support your position. So isn't it a little bit difficult to ascertain the state of Illinois law with respect to this very issue? And, you know, that's why this court provides some clarity. This is a good opportunity to address it directly and offer clarity. Well, who would we follow, and what approach would we take? The Eilert approach, there's no expectation of privacy. I'm sorry, the what? The people of the Eilert approach that I had cited to in my case. There's no expectation of privacy in the commons area. The locks are there for security purposes. Would anyone in their right mind leave their wallet and their keys and a dish out in the commons area? No, they wouldn't. Would they do that in the privacy of their own home? Yes, they would. Why? Because there's clearly a difference. There's a wide chasm there, a very wide chasm. I'm sorry we didn't get to address the sentencing error issue, or the third issue, which was the sentencing error. Can I please request an amendment? Actually, I have a question about that anyway, so go ahead. There was an amendment to Rule 472E. The E provision requires that this court remand for sentencing error issues to the trial court. The state takes no issue with their argument. There is 518 days owed in the pre-sense custody credit. The trial court is the proper venue to bring that. They have jurisdiction over that. Okay. So it should be remanded to the trial court. Yes. Thank you. Thank you, counsel. Mr. Walker. I'll be brief. Regarding the first issue, whether the officer set exigent circumstances to enter Tamayo's home, we have to remember that the Fourth Amendment is the rule and that exigent circumstances is the exception. In this case, the state is arguing that there's danger to the officers, there's danger to the public. The same danger that could have existed would have existed whether they got a warrant or not. The same danger of an ambush, the same danger of Mr. Tamayo being harmed, would have been the same whether they got a warrant or not. As we find out, Tamayo is at home asleep in his bed. The sanctity of the home is without question. So it is incumbent upon the state to show that Tamayo was an immediate threat. Can I interject a question? I think the state alludes to this. Was there any definitive evidence that they knew it was Tamayo who was laying in the bed? Did the police know that he was the person that they were looking for in the bedroom? His parents told him, told officers, that Tamayo was in his room. So they did know. But when they looked in the window, did they know who that was, or did they just know there was a young male apparently sleeping? Based on the officer's testimony about Tamayo's family, they told him that Juan was in his bed. She's saying when they first got there and looked in the window before they got up to the apartment door, did they know it was Tamayo when they saw him laying there? They did not look into the apartment window until after they were already in the apartment. That was when Sergeant Holtz told Detective Grace to hold up. We don't want to go in there. He's armed and ready to shoot us. So he backtracked, went outside, and saw Tamayo sleeping in his bed. So ultimately what we have here is a question of whether the possible danger from somebody who might be armed overwhelms the warrant requirement for them, and people being brown found that was not the case, that if the officers could make sure that the defendant didn't escape, and in this case they could, then it would be better for them to simply surround the apartment complex and get a warrant. Everything that Grace did would have been fine if he had a warrant. We wouldn't have this question of exigent circumstances, and we definitely wouldn't have this kind of dissent concern. But Detective Grace, basically acting as though this was an arrest with a warrant, proceeded without a warrant, although a 24-hour on-duty judge was made. Regarding the consent issue, I did note in my brief that Indicta Pupil V. Burns stated that the secure common area was clearly not open to the general public, and that was of some concern in their analysis, that clearly the residents had an expectation of privacy in that area. Now, while the state pointed out that you might not leave your keys or your wallet out there, you also would expect that a random homeless person could just walk in and start knocking on your door and asking for change. There are levels of privacy. There are levels of expectations in privacy. And in this case, to my knowledge, the rest of the residents had an expectation that police could not simply enter into their space without their consent, or at least without obtaining consent from the landlord, which they testified they did not obtain. And that's based on what? A combination of cases. Pupil V. Blake was the first issue case that pointed out that a landlord can grant authority to access common areas. But they held there there was no expectation of privacy under those facts, correct? Correct. But these are exceptions. They're carving out exceptions, pointing out that somebody has to give police voluntary consent to enter that space, or it has to be open to the public. None of that exists here. Is it your contention that the building's vestibule was the defendant's curtilage? It's my contention that it was collective curtilage, much like a patio space or something to that effect. The residents have a property interest in that space that is exclusive. It is not open to the public, and the police officers comprise the public in these cases. Well, the public can enter, but they need... It's no different than having a private pool yard or just because it's outside. It's no different than having a private pool just because it may be outside and accessible by jumping a fence or something to that effect. It doesn't mean that you're inviting people in. They have a lock on the door. But most of the cases have talked about the actual location, the outside area of the apartment that's in question. They don't seem to go back and talk about all the common areas. And where they do talk about a common area, I can't remember the name of the case, but the landing was right there, and it was right in front of the door that they wanted to get into. Has any case really talked about that locked door on the first floor that they have to go through?  Okay. So, to my request that the court reverse the trial court's decision and demand for additional proceedings. Thank you. Thank you, counsel. We will indeed take the matter under advisement. Thank you for your arguments this morning. We will issue a decision in due course.